FREIT v. BELMONT.

(Supreme Court, Appellate Division, First Department. June 11, 1909.)

1. MASTER AND SERVANT (§ 29*)—ABANDONMENT OF EMPLOYMENT—DISCHARGE.
Where plaintiff, with his mother's written consent, agreed to work for defendant in his racing stables for five years for certain compensation, defendant having the option to discharge plaintiff and cancel the agreement at any time, and defendant thereafter, within the contract period, wrote to plaintiff's mother, stating that he was giving up his racing stable and would therefore have no further need of plaintiff's services, but would endeavor to get him a good position elsewhere, if his mother consented, when plaintiff's mother took him from defendant's stables, the letter authorized plaintiff to consider the relations between himself and defendant terminated and his leaving the service was not an abandonment of the employment.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 28, 29; Dec. Dig. § 29.*]

2. LIBEL AND SLANDER (§ 9*)—WORDS IMPUTING UNFITNESS IN EMPLOYMENT—EMPLOYÉS.
Where plaintiff agreed, with his mother's consent, to work for defendant for five years in his racing stables, subject to being discharged at defendant's option, and defendant thereafter terminated the relations between them by writing to plaintiff's mother that he had no further need of his services, the subsequent publication by defendant in a racing journal of a notice that, plaintiff having left his employ without his consent or written discharge, owners were thereby warned not to harbor or employ him, was not a fair statement of the relations then existing between plaintiff and defendant, so that a judgment for defendant in an action for libel of plaintiff in his calling will be reversed and a new trial granted.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 80; Dec. Dig. § 9.*]

Houghton, J., dissenting.

Appeal from Trial Term, New York County.

Action by John H. Freit, by David W. Rockmore, his guardian ad litem, against August Belmont. From a judgment for defendant, and

---

an order denying a new trial, plaintiff appeals. Reversed, and new trial granted.

Argued before INGRAHAM, McLAUGHLIN, LAUGHLIN. HOUGHTON, and SCOTT, JJ.

Charles Goldzier, for appellant.

William Rand, Jr. (Alfred W. Haywood, Jr., on the brief), for respondent.

LAUGHLIN, J. The action is brought to recover damages for an alleged libel of the plaintiff in his vocation and calling of riding running horses in exercising them for racing. On the 10th of May, 1900, the defendant was conducting a racing stable, and on that day the plaintiff, who was then 12 years of age, with the consent of his mother, manifested by a certificate in writing indorsed thereon, signed an agreement with the defendant by which he attempted to bind himself to serve the defendant in the latter's racing stable for a term of five years from that day, on condition that the defendant should, as compensation for his services, during the first two years clothe and board him, and in addition pay him $10 per month during the third year, and $15 per month during the fourth and fifth years. The agreement was in duplicate. The defendant signed one, which was delivered to the plaintiff, and the plaintiff signed the other, which was delivered to the defendant. It was expressly provided therein that the defendant should have the right, at his option, to discharge the plaintiff and cancel the agreement at any time, and it was further provided that at the expiration of the term the defendant should have "first call" on the services of the plaintiff, should he desire to engage the plaintiff in any capacity in his racing stable; the compensation to be paid on such new employment "to be a just and reasonable one." On the 15th day of September, 1904, the defendant caused the following publication to be made in a newspaper called the "Racing Calendar," which had a circulation of about 1,500 issues per day in and about the city of New York, to wit:

"Exercise boy, John Freit, having left the employ of August Belmont, without consent or a written discharge, owners and trainers are hereby warned not to harbor or employ him, and attention is called to rule No. 152 of the rules of racing, which will be strictly enforced."

It is alleged in the complaint that this publication was made maliciously, with intent to injure the plaintiff in his good name and vocation as an "exercise boy," and to prevent him from securing employment in the occupation of a rider at racing stables, and that the defendant thereby meant and intended to have it understood by the readers of the article that the plaintiff was a person who could not be depended upon, and that he had been guilty of treachery to his employer in leaving without his consent or written discharge, and had violated his employer's confidence in breaking his agreement. The plaintiff further alleged that the publication was false, and that he had been deprived thereby of obtaining other employment. The answer of the defendant is, in effect a plea of justification.

The plaintiff entered the defendant's employ pursuant to the in-

denture. On the 7th day of October, 1903, the defendant wrote the plaintiff's mother as follows:

"I am giving up my entire racing stable, and will therefore have no further need of the services of your son, John. I will, however, endeavor to get a good position for him elsewhere, provided you consent to it."

At the time of the original employment, and at this time, the mother of the plaintiff resided at Jersey City, N. J. Pursuant to the terms of the employment, the defendant was to board the plaintiff, and it is manifest that it was understood that the plaintiff was to be boarded at the racing stable, and not at his home. At the time this letter was written, the boy was at Morris Park race track, and had been there employed in exercising racing horses owned by the defendant. He evidently boarded and slept at the track. The plaintiff's mother received this letter the day after its date, and immediately went to the Morris Park race track, and on that day took her boy back to Jersey City, without having any further communication with the defendant, or with any one representing him, except to show the letter to defendant's representative at the track when she went there to take her boy away. On that day, the defendant finished the sale of his horses at Morris Park race track, and he discharged several other employés, and had no further use for the services of the plaintiff.

The principal question presented by the appeal arises on an exception to the refusal of the court to instruct the jury, as matter of law, that this letter, written by the defendant, constituted a discharge of the plaintiff, and was in effect an exercise of the defendant's right to discharge the plaintiff and cancel the agreement. We are not concerned with the validity of the agreement; but it is important to note that the defendant therein reserved the right to discharge the plaintiff at will, and that in this letter of October 7th he informed the plaintiff's mother that he was giving up his entire racing stable, and would have no further need of the services of her son, and manifested a willingness to endeavor, with her consent, to get him a position elsewhere. The plaintiff's mother, having acted upon this letter, and having gone to the place where her son was employed by the defendant, and having taken him home, we are of opinion that the defendant cannot now be heard to say that he did not intend to discharge the boy, and that he was not justified in notifying through the Racing Calendar those who would likely need the services of an "exercise boy" that the plaintiff left his employ without his consent or a written discharge.

It is claimed that the letter is ambiguous, and that it is susceptible of the construction that the defendant did not intend to release the plaintiff from his contract of employment for five years, and that the subsequent conduct of the parties and correspondence between them show that it was not understood as a discharge. We find in the record no evidence of conduct on the part of the plaintiff, or on the part of the mother, necessarily inconsistent with the plain inference that any person of ordinary intelligence would draw from this letter, namely, that the defendant intended to give notice to the plaintiff, through his mother, that he would no longer be bound by the indenture agreement. There is no suggestion in the letter with respect to the

board and clothing or wages of the boy for the remainder of the indentured term. The boy was under no obligation by virtue of the indenture to work for any one other than the defendant. The defendant did not reserve the right to let the plaintiff's services out to others. There had been no negotiations on that subject. The letter would ordinarily be understood as meaning, and manifestly defendant then intended it to mean, that he would have no further use for the services of the plaintiff; and as conclusive evidence of that fact, he stated that he was giving up his entire racing stable. He merely offered to assist the boy in getting another situation, provided the mother wished him to do so.

Stress is laid by the learned counsel for the defendant upon a letter which the defendant claims to have written to the plaintiff, under date of October 10, 1903, but which she denies having received until after she had secured other employment for her boy on the 12th of the same month. In this letter he says:

"Mr. L. V. Bell has asked to have your boy, John, transferred to his stable. He has assured me that he will give him mounts, and as it is a good place, and will afford him good opportunities, I have consented to his going. Please tell your boy to report at Mr. Bell's stable at Sheepshead Bay."

Under date of October 15, 1903, the defendant wrote a letter to the plaintiff's mother, which she admits having received before her son went to work for Mr. Bell, but not until after she had made the arrangements with his trainer, Mr. McCormick, for such services. In that letter he says:

"I understand that your son, John, will report for duty to Mr. L. V. Bell in a day or two. As you are aware, the indenture binding him to serve in my racing stable does not expire until May, 1905, and it is understood that he is to be returned to my service at such a time during the term of the indenture as I may want him. I believe it will be a good opportunity for your boy, and Mr. Bell has told me he will give the boy a chance to ride. In the meantime I have no doubt that Mr. Bell will make satisfactory arrangements as regards compensation to be paid the boy, which is to be in lieu of any amount to which he is entitled for his services from me during such time as he may remain in Mr. Bell's services."

The defendant must have known that he had no authority to consent to a transfer of his contract for the personal services of the plaintiff to another without the consent of the plaintiff and of his mother. Assuming that she did receive the letter before contracting with Bell, it did not deprive her or the plaintiff of the right to enter Bell's employ, and the entry of the plaintiff into Bell's employ thereafter would not constitute a ratification of this assumed authority, exercised by the defendant after he had discharged the boy. It was conceded on the trial that, for the purpose of the transactions in question, the plaintiff's mother stood in his place. It appears by the testimony of the plaintiff's mother that, the day after she took her boy from Morris Park, she received a telegram or letter from one McCormick, who was a trainer for Bell, who had a racing stable at Sheepshead Bay, stating that he would like to have the boy in his stable, and asking her to come out to Sheepshead Bay to see him; that she, with plaintiff, went there on the 12th of October, and was informed by McCormick

that the boy had been highly recommended, and that he had been recommended by the defendant to Mr. Bell, and he thereupon hired the boy, but that the plaintiff did not commence work under McCormick until the 18th or 19th of the month. The plaintiff at the time of that interview was only 13 or 14 years of age, and his version of the conversation between his mother and McCormick, the date of which he does not give, is that the former asked his mother if she was willing that he should go to work for him, and the mother replied in the affirmative, and they agreed upon $25 per month as his wages, which was $5 per month more than he was receiving from the defendant, although he did the same kind of work. McCormick testified that he had no conversation with the plaintiff's mother before the plaintiff came to work for him on the 18th or 19th of October, but that he had a prior conversation with the defendant, knowing that the latter was closing out his stable, in which he asked the defendant if he had any promising indentured boys, and the defendant recommended the plaintiff, saying that he could let Mr. Bell have the plaintiff on the terms of his indenture until he resumed racing again; that when the plaintiff came to Sheepshead Bay he said to the witness, "I have come down to go to work," to which the witness replied that it was not according to the agreement, as he was to be there "the next day or the following day," as the defendant had said the plaintiff would report at once; that, on being asked where he was in the meantime, the plaintiff said, "Well, I wanted to take a few days off; I wanted to visit some relatives;" that nothing was said about the arrangement made between the witness and the defendant, excepting that the witness testified, "I said to him, then, of course, his wages would be about the same as Mr. Belmont's; that I was carrying out Mr. Belmont's orders as far as the salary and occupation was concerned." The witness then, in answer to a leading question, stated that the plaintiff said, when he first came to Sheepshead Bay, "I have come down to go to work as Mr. Belmont ordered." On the 2d day of July, 1904, while the plaintiff was still working for Bell, the defendant wrote his mother as follows:

"As you are aware, the apprenticeship of your son, John, does not expire until May of next year. When I sold my horses last autumn, and turned the boy over to Mr. Bell, it was, as I wrote you at the time, and as I gave Mr. Bell to understand, only a temporary arrangement, in the event of my desiring the boy's services in my own stable again. My yearlings are coming up from Kentucky on the 11th of this month, and I should like to have you arrange for the boy to report at Babylon on or before that date. I will write Mr. Bell, acquainting him with my wishes in the matter."

To this she made no reply. The plaintiff worked for Bell under McCormick about a year, and then the defendant wrote a letter to McCormick on the 30th of August, 1904, referring to a letter from the latter to him on the day before, which is not in the record, stating that he would like to have the plaintiff back in his stable again, as he intended to try his yearlings, and would need the services of the plaintiff, and requesting that the plaintiff be sent to one Joyner, to whom he had written about the matter. On the 6th day of September, thereafter, plaintiff's mother received another letter from the defendant,

stating that he had been informed by McCormick that Bell had no further use for her son's services, and that he had instructed McCormick to send her son to Joyner, who had some of his horses in care, and complaining that the boy went home instead of complying with his direction, and informing her that under the circumstances her son was not entitled to a discharge, and under the rules of racing could not obtain a position in any other stable, and that he had notified the secretary of the Jockey Club, and that a notice to that effect would be published in the Racing Calendar. The notice was published accordingly. The plaintiff's mother replied to this letter on the 19th of the same month, drawing his attention to his letter of October 7, 1903, which she claimed to be a discharge, and saying that at his suggestion she had allowed the boy to go with Mr. Bell on the promise that he was to have a chance to ride, which promise had not been fulfilled. The defendant answered this on the 28th day of the same month, inclosing copies of his letters of October 10th and 15th, stating that the latter had been sent to her "in order that my letter of October 10th should not be misunderstood," and asserting that her son was to be returned to his service at such a time as he wanted him. On the 30th day of November, 1904, plaintiff's mother again wrote the defendant, asserting that she understood his letter of October 7, 1903, as a discharge, and saying that she was anxious to correct any misunderstanding that might exist concerning her conduct in the matter. This letter evidently was prompted by the notice published in the "Racing Calendar," which is the basis of the action. It discusses her understanding of the situation, and manifests regret over the controversy which had resulted in her son being deprived of employment; but it contains no admissions inconsistent with her claim that she understood at the time that the letter of October 7, 1903, was a discharge.

The defendant's attempt, by his letter of October 15, 1903, to continue the indenture agreement in force after he had discharged the plaintiff, is of no avail. A new agreement might have been made to that effect; but he could not make a new agreement for the plaintiff. Neither the plaintiff nor his mother had any communication with the defendant after the letter of October 7, 1903, until after the plaintiff entered the employ of Bell. It is quite immaterial whether that employment was secured as testified to by the plaintiff or his mother, or whether it was secured by the defendant. It was in any event a new employment inconsistent with the indenture to the defendant, and there was no agreement on the part of the plaintiff and his mother that the indenture should remain in force after he entered the employment of Bell. The defendant cannot be heard to say that the plaintiff could not have obtained employment from Bell without his consent, and that, as he gave his consent to Bell's representative upon the understanding that the indenture should remain in force, the plaintiff is bound thereby. The defendant had the right to discharge the plaintiff at will; but he had no right to deprive him of obtaining other employment, or to make it a condition of his obtaining other employment that the indenture should remain in force. Nor did he even

have the right under the indenture agreement to hold the plaintiff's services without requiring the performance of any duty. The plaintiff presumably did not enter the defendant's employ solely with a view to obtaining his clothing and board for the early years and a small compensation for the other years. His purpose presumably was to become fitted by riding to earn higher wages, and therefore he was entitled to an opportunity to develop his skill in that direction. Any agreement or understanding, therefore, between the defendant and Bell, or Bell's representative, upon which the defendant claims he consented to the transfer of the plaintiff's services, is of no importance, for it is not binding on the plaintiff. The most favorable view of the evidence to the defendant is that he recommended the plaintiff to Bell, and that before the plaintiff entered Bell's employ he notified the plaintiff's mother that on the termination of such employment he would claim the right to the boy's services under the indenture agreement. That, however, he had no right to do. He had already discharged the boy, and the latter was freed from the obligations of the indenture agreement, and entitled to any employment he could obtain. The defendant, therefore, was not justified in depriving the plaintiff of employment, by publishing to those who were bound under the racing rules to refuse employment in such circumstances that the plaintiff left his employ without his consent and without being discharged.

It follows, therefore that the judgment and order should be reversed, and a new trial granted, with costs to appellant to abide the event.

McLAUGHLIN, J., concurs. HOUGHTON, J., dissents.

INGRAHAM, J. I concur with Mr. Justice LAUGHLIN on the ground that the letter of October 7, 1903, was a written discharge, which authorized the plaintiff to consider that the relations between himself and the defendant were terminated, and that the notice published in the Racing Calendar was not a fair statement of the relations that existed between the plaintiff and defendant.

SCOTT, J., concurs.